FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

AUG 22 2022

BY
DEPUTY _____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | No. 1:21-CR-112 (10) |
| v. | § | |
| | § | |
| ADAM P. RUNSDORF | § | |

## FACTUAL BASIS

The United States of America, joined by the defendant, **Adam P. Runsdorf**, and the defendant's attorney **George M. Karavetsos**, presents this factual basis and stipulation in support of the defendant's plea of guilty to Counts One, Two, and Three of the third superseding indictment, and in support would show the following:

1. That the defendant, **Adam P. Runsdorf**, stipulates to the truth of all matters set forth in this factual basis and stipulation, and agrees that it may be used by the Court in support of his plea of guilty to Counts One, Two, and Three of the third superseding indictment, which charge violations of 18 U.S.C. § 371, conspiracy; 18 U.S.C. § 2320(a)(4), trafficking in drugs with counterfeit mark; and 18 U.S.C. § 1956(h), conspiracy to commit money laundering.

2. That the defendant, who is pleading guilty to the third superseding indictment, is one and the same person charged in the third superseding indictment.

3. That the events described in the third superseding indictment occurred in the Eastern District of Texas and elsewhere.

4. That had this matter proceeded to trial, the government, through the testimony of

witnesses, including expert witnesses, and through admissible exhibits, would have proven, beyond a reasonable doubt, each and every essential element of the offense alleged in the third superseding indictment; specifically, the government would have proven the following stipulated facts:

## INTRODUCTION

a. Prescription cough syrups commonly contain Promethazine, Promethazine with Codeine, Promethazine with Dextromethorphan, and Dextromethorphan with Pseudoephedrine. These cough syrups are approved by the United States Food and Drug Administration (FDA) for distribution only under the supervision of a practitioner licensed by law to administer such drugs within the United States. Over-the-counter cough syrups commonly contain lower concentrations of Dextromethorphan and Pseudoephedrine. The term "drug" is defined by section 201 of the Federal Food, Drug, and Cosmetic Act (FDCA). Promethazine, Codeine, Dextromethorphan, and Pseudoephedrine are "drugs" within the meaning of the FDCA, and the FDA regulates them.

b. Cough syrups can produce tranquilizing and euphoric effects when consumed at higher-than-recommended doses. Popular music has glamorized drinking cough syrup for its intoxicating effects, and certain brands have become popular among recreational drug users across the United States. Cough syrup mixed with a soft drink is sometimes referred to as "syrup," "drank," or "lean." Cough syrups vary by brand in terms of coloring, taste, and viscosity.

c. Manufacturers identify their brands with labels that are marked with their trademarked name and logo.

- Actavis Prometh VC With Codeine cough syrup is a prescription drug manufactured and distributed by Actavis Holdco US, Inc. (Actavis Holdco US, Inc. is a subsidiary of its parent company, TEVA Pharmaceuticals USA, Inc.). The Actavis logo is owned by Actavis Holdco US, Inc. and registered in the principal registry in the United States Patent and Trademark Office.

- Hi-Tech Promethazine Hydrochloride and Codeine Phosphate Oral Solution is a prescription drug manufactured and distributed by Hi-Tech Pharmacal (now Akorn). The "Hi-Tech" name and logo are owned by Hi-Tech Pharmacal (now Akorn) and Akorn retains common law trademark rights to the "Hi-Tech" name and logo.

- Wockhardt Promethazine Syrup Plain is a prescription drug manufactured and distributed by Wockhardt USA LLC. The "Wockhardt" name is a trademark owned by Wockhardt USA LLC and registered in the principal registry in the United States Patent and Trademark Office.

- PAR Promethazine VC with Codeine Oral Solution is a prescription drug manufactured and distributed by Par Pharmaceutical Companies, Inc. (Par Pharmaceutical Companies, Inc. is a subsidiary of its parent company, Endo International). The "PAR" name and logo are trademarks owned by Par Pharmaceutical Companies, Inc. and registered in the principal registry in the United States Patent and Trademark Office.

- Qualitest Promethazine DM Syrup is a prescription drug manufactured and distributed by Generics Bidco I, LLC, doing business as, Qualitest Pharmaceuticals, Inc. (Generics Bidco I, LLC, doing business as, Qualitest Pharmaceuticals, Inc., is a subsidiary of its parent company Endo International). The "Qualitest" name and brown/white stripe are trademarks owned by Generics Bidco I, LLC, doing business as Qualitest Pharmaceuticals, Inc., and registered in the principal registry in the United States Patent and Trademark Office.

- Tris Pharma Promethazine Hydrochloride and Codeine Phosphate Oral Solution is a prescription drug manufactured and distributed by Tris Pharma, Inc. The "Tris Pharma" name and "Tris" logo are trademarks owned by Tris Pharma, Inc. and registered in the principal registry in the United States Patent and Trademark Office.

- Amneal Promethazine HCI and Codeine Phosphate Syrup is a prescription drug manufactured and distributed by Amneal Pharmaceuticals, LLC. The "Amneal" name and script logo(s) are trademarks owned by Amneal Pharmaceuticals, LLC and registered in the principal registry in the United States Patent and Trademark Office.

### THE MARSHALL DRUG TRAFFICKING ORGANIZATION

d. Beginning in or about January 2014, Byron A. Marshall, a/k/a "Robert Griffin," a/k/a "Dr. Griffin," a/k/a "Doc" (Marshall) and Cheryl A. Anderson, a/k/a "Angela Thomas" (Anderson) devised a scheme to manufacture and traffic counterfeit cough syrup. The principal object of the scheme was financial gain. Marshall and Anderson were joined by Tunji Campbell, a/k/a "Michael Duke," a/k/a "Mike" (Campbell), who became a partner in the scheme (hereinafter "Marshal Drug Trafficking Organization," "Marshall DTO," or "DTO"). Ashley A. Rhea, a/k/a

    Ashley A. Johnson, joined the DTO after Campbell. Rhea's participation in the DTO included facilitating the storage, transportation, and distribution of counterfeit cough syrup.

e. The Marshal DTO sought to copy Actavis Prometh VC With Codeine (Actavis). Actavis is a purple, peach-mint flavored prescription cough syrup that was in demand as a street drug. Marshall and Anderson wanted to mass produce and traffic a counterfeit version of Actavis that contained Promethazine, but not Codeine, which is a federally controlled substance. On April 24, 2014, Actavis Holdco US discontinued production of Actavis due to its widespread abuse by recreational drug users. After that, the street value of Actavis increased to more than $3,000 per pint.

f. Marshall and Anderson posed as a physician ("Dr. Griffin") and assistant ("Angela Thomas") to solicit various pharmaceutical companies to copy and manufacture Actavis without its active ingredients, Promethazine and Codeine. Marshall and Anderson would add Promethazine to the counterfeit substance prior to bottling and distribution.

g. In January 2014, Pernix Manufacturing LLC (Pernix) agreed to copy and manufacture syrup according to Marshall and Anderson's directions. The Pernix pharmaceutical manufacturing facility was located at 10863 Rockley Road in Houston, Texas.

h. Kalpen D. Patel (Patel), a Pernix product-development scientist, worked with Marshall and Anderson to recreate the Actavis product. Patel used a sample of Actavis provided by Marshall to formulate the new syrup base. Patel knew that the sample contained Codeine and Promethazine, and he recreated it without those ingredients. Patel referred to the new product as a "placebo" (hereinafter "syrup base" or "syrup"). Syrup base is a necessary component of cough syrup. Early in the conspiracy, Anderson was able to acquire Promethazine for the syrup base from online chemical distribution businesses.

### ADAM P. RUNSDORF AND WOODFIELD PHARMACEUTICAL

i. **Adam P. Runsdorf (Runsdorf)** owns a group of pharmaceutical companies including Woodfield Pharmaceutical LLC, a contract manufacturing company, and Woodfield Distribution LLC, a third-party logistics company (collectively, "Woodfield"). **Runsdorf** runs Woodfield and his other companies from one office in Boca Raton, Florida. Woodfield Distribution LLC operated a warehouse facility in the Houston area of Texas.

### WOODFIELD ENTERS INTO BUSINESS WITH THE MARSHALL DTO

j. On April 25, 2014, as Pernix was scaling-up production of the syrup base for Marshall and Anderson, **Runsdorf** acquired Pernix, and it became a Woodfield Pharmaceutical manufacturing facility. **Runsdorf** retained Pernix's employees, but made changes to the management staff. **Runsdorf** promoted Patel to Research and Development Manager. In that role, Patel supervised Woodfield's chemical formulation development, optimization, and scale-up for clients. Patel worked with Marshall and Campbell in that capacity throughout the conspiracy. In March 2015, **Runsdorf** hired Willis Reed (Reed) to be Woodfield's Production Manager. In that role, Reed was responsible for producing the syrup base for the Marshall DTO. Jonathan R. Shaver (Shaver) worked within Woodfield's manufacturing and operations division and assisted Reed with the production of the syrup. Shortly thereafter, **Runsdorf** promoted Reed to Director of Technical Operations. Reed then promoted Shaver to Production Manager. Reed and Shaver knew that the Marshall DTO was adding active ingredients to the syrup base Woodfield sold to them. Gina Acosta (Acosta) and Maria Anzures-Camarena (Anzures-Camarena) assisted in the packaging and delivery of the syrup base for Woodfield. Acosta was Woodfield's Packaging Supervisor.  Acosta and, to a lesser extent, Anzures-Camarena, held special positions of trust with **Runsdorf**.

k. As Director of Technical Operations, Reed ran the manufacturing facility from April 2015 until January 2019. During that time, Reed and Shaver were principally responsible for the large-scale production of syrup base for the DTO. Beginning on or about May 26, 2015, Reed became the DTO's principal source of supply for Promethazine. Reed obtained the Promethazine from BOC Sciences (BOC), a lab chemical supplier based in Shirley, New York. At Reed's direction, BOC delivered the Promethazine directly to Marshall and Campbell. When the DTO had difficulty dissolving Promethazine into the syrup base, Reed and Shaver worked with Patel to resolve the issue. Marshall and Campbell paid cash to Reed for these extra services. Reed was to share the cash with Shaver and Patel.

l. Under Reed, and later under Patel, the syrup was typically produced in 2,000 gallon "batches" packaged in forty 55-gallon barrels that held 50 gallons per barrel. Woodfield produced the batches at a cost of approximately $10,000 per batch and sold them to the DTO for up to $60,000 per batch.

m. Woodfield's business relationship with Marshall was irregular in various respects. Marshall was not authorized or licensed to distribute cough syrup. Any background check of the personal information provided by Marshall to Woodfield would have revealed that "Dr. Griffin" was not a licensed physician. Further, Woodfield's production of syrup base for Marshall bypassed the protocols for

safety and quality testing. Under Reed, there were no "batch records" to document the production of the syrup as required, and it was the only product that Woodfield packaged in barrels. Woodfield provided the syrup to the DTO without any corresponding documentation that identified the ingredients of the syrup. It was also unusual that the DTO picked-up the syrup base from the manufacturing facility using rental box-trucks, usually after regular business hours.

n. Payment for the syrup base also differed from Woodfield's ordinary business. The DTO did not pay Woodfield from one bank account. Rather, the DTO paid for the syrup by checks drawn on various bank accounts that bore no association to any legitimate business or entity. Between 2014 and 2018, Woodfield accepted payment from the DTO in the form of checks from A+ Accounting & Bookkeeping, a defunct company owned by Anderson (18 checks totaling $278,000); Boya Enterprises LLC, a shell company owned by Campbell (18 checks totaling $415,000); and RTW Labs LLC, a shell company owned by Marshall (7 checks totaling $85,000). Woodfield also accepted cashier's checks from Marshall (2 checks totaling $35,000) and "E.J." (2 checks totaling $34,000). Other DTO payments came in the form of one personal check from Campbell (totaling $10,000) and one wire-transfer from Chauntell D. Brown, a/k/a "Juan Brown" (totaling $15,000). In sum, Woodfield accepted $872,000 in checks from the Marshall DTO. Woodfield deposited all of the checks into Bank of America Account 898052477039, an account belonging to Woodfield that listed **Runsdorf** as President (the Woodfield Pharmaceutical bank account). Funds from that account were subsequently moved to three separate accounts: Bank of America Account 898052301040, belonging to "Centrix Pharmaceutical Inc," Bank of America Account 898050281913, belonging to "Woodfield Distribution LLC," and Wells Fargo Account 2000022339582, belonging to "225 South Aviation LLC."

o. At **Runsdorf**'s direction, the DTO's payments to Woodfield transitioned into cash in or about September 2017, and continued on a cash-only basis until February 2021. Cooperating defendants would testify that the total amount of cash paid by the DTO to **Runsdorf** was at least $3 million. Over the same time period, approximately $77,400 cash was deposited into the Woodfield Pharmaceutical account. At all times relevant to the indictment, Marshall and Campbell had no legitimate source of income. The money that Marshall and Campbell paid to Woodfield, **Runsdorf**, and other coconspirators was derived exclusively from the sale of counterfeit drugs, a "specified unlawful activity" within the meaning of federal law.

p. Cooperating defendants would testify that **Runsdorf** and the other coconspirators at Woodfield knew that the money paid by Marshall and Campbell flowed directly

from the specified unlawful activity. In fact, Woodfield was sometimes required to provide the syrup on credit so that the DTO could sell it to generate funds to purchase additional syrup.

q. **Runsdorf** conducted financial transactions with the proceeds of specified unlawful activity when he received payments from the DTO. **Runsdorf** required the DTO to pay him by cash in order to disguise the nature and source of the proceeds. **Runsdorf** further disguised the nature and source of the proceeds by layering them through various financial systems, including multiple bank accounts and casinos.

r. **Runsdorf** also knowingly engaged in monetary transactions with receipts from the DTO. These transactions included transfers from the Woodfield Pharmaceutical bank account to the other **Runsdorf**-controlled bank accounts, and payments to **Runsdorf**'s American Express credit card. **Runsdorf** knew the funds involved in the monetary transactions were from counterfeit drug sales, criminally derived, and the proceeds of specified unlawful activity. Certified copies of **Runsdorf**'s bank records indicate that the funds involved in the transactions were in amounts greater than $10,000.

s. In or about 2016, Chauntell D. Brown, a/k/a "Juan Brown" (Brown), became the DTO's principal source of supply for counterfeit labels. Brown was also an investor in the DTO. Reed introduced Brown into the conspiracy to assist with bottles and labels. Brown operated a business called AB Packaging Solutions LLC that provided packaging and labeling services for Woodfield. Brown obtained counterfeit cough syrup labels according to specifications provided to him by Marshall and Campbell. Over the course of the conspiracy, Brown provided the DTO with commercial-grade pharmaceutical labels counterfeited to look exactly like the genuine labels for the prescription cough syrups described above in paragraph (c). The Marshall DTO employed illegal aliens to affix the labels to bottles of the cough syrup.

t. The Marshall DTO distributed the counterfeit cough syrup through wholesale traffickers who moved large quantities of the bottled product to various smaller traffickers who sold it across Texas, Louisiana, Mississippi, Alabama, Georgia, South Carolina, Tennessee, Wisconsin, California, Florida, Arkansas, Ohio and the Commonwealth of the Bahamas. Prices generally ranged from $100 to more than $1,000 per one-pint bottle. Depending on the market and brand of cough syrup, prices went as high as $3,800 to $4,000 per pint.

u. In July through August of 2017, DEA investigators employed Court authorized wiretap interceptions for the cellular phones of Marshall, Reed, and Brown. In this

way, DEA investigators intercepted drug-trafficking related conversations between the principals of the Marshall DTO distribution scheme. Intelligence from the intercepted conversations led to numerous seizures of the counterfeit syrup. A non-exhaustive list of the law enforcement interdictions of the Marshall DTO's counterfeit cough syrup includes the following:

- On January 11, 2017, a Louisiana State Police officer in Bossier Parish Louisiana performed a lawful traffic stop and search of a vehicle driven by R.F. The officer found 32 8-ounce bottles of containing counterfeit Actavis cough syrup. The bottles were marked with "Actavis Prometh VC with Codeine" labels that were identical or indistinguishable from Actavis's genuine labels and registered trademark such that the use of the labels was likely to confuse, cause mistake, or deceive.

- On March 8, 2017, Marshall sold 128 eight-ounce bottles of counterfeit Actavis cough syrup to an undercover DEA agent and a cooperating witness (CW1) in Pearland, Texas. The purchase price of $7,500 cash was paid to Marshall at the meeting. The bottles were marked with "Actavis Prometh VC with Codeine Cough Syrup" labels that were identical or indistinguishable from Actavis's genuine labels and registered trademark such that the use of the labels was likely to confuse, cause mistake, or deceive. Campbell was present and helped Marshall transfer the bottles from Marshall's vehicle to the undercover agent's vehicle. An FDA forensic chemist performed an analysis of the syrup and determined that it contained Promethazine.

- On May 4, 2017, Marshall sold 192 eight-ounce bottles of counterfeit Actavis cough syrup to CW1 in Beaumont, within the Eastern District of Texas. CW1 paid the purchase price of $13,000 to Marshall's courier. The bottles were marked with "Actavis Prometh VC with Codeine Cough Syrup" labels that were identical or indistinguishable from Actavis's genuine labels and registered trademark such that the use of the labels was likely to confuse, cause mistake, or deceive. An FDA forensic chemist tested the syrup and confirmed that it contained Promethazine.

- On July 21, 2017, Rhea mailed two packages containing 32 eight-ounce bottles of counterfeit Actavis cough syrup from Pearland, Texas to Cleveland, Ohio. The bottles were marked with "Actavis Prometh VC with Codeine Cough Syrup" labels that were identical or indistinguishable from Actavis's genuine labels and registered trademark such that the use of the labels was likely to confuse, cause mistake, or deceive.

- In or about July 2017, Marshall and Campbell approached Patel with a bottle

of Hi-Tech Promethazine Hydrochloride and Codeine Phosphate Oral Solution (Hi-Tech). Hi-Tech is a red, fruit-flavored prescription cough syrup that was in large demand as a street drug. Patel reformulated the Hi-Tech cough syrup without the Promethazine and Codeine, and Woodfield began producing it for the DTO.

- On August 22, 2017, Marshall sold 24 pints of counterfeit Hi-Tech cough syrup to a cooperating witness in Beaumont, Texas. The bottles were marked with counterfeit "Hi-Tech Promethazine Hydrochloride and Codeine Phosphate Syrup" labels. An FDA forensic chemist analyzed the syrup and determined that it contained Promethazine.

- On August 23, 2017, coconspirators attempted to transport 20 pints of counterfeit Hi-Tech cough syrup to San Antonio, Texas. The bottles bore counterfeit "Hi-Tech Promethazine Hydrochloride and Codeine Phosphate Syrup" labels. An FDA forensic chemist tested the syrup and confirmed that it contained Promethazine.

- On August 24, 2017, Anderson transported 226 pints of counterfeit Hi-Tech cough syrup to San Antonio, Texas. The bottles bore counterfeit "Hi-Tech Promethazine Hydrochloride and Codeine Phosphate Syrup" labels. An FDA forensic chemist tested the syrup and confirmed that it contained Promethazine.

- On October 21, 2017, a coconspirator used an automobile to transport 319 pints of counterfeit Actavis cough syrup in Freestone County, Texas. The bottles bore "Actavis Prometh VC with Codeine Cough Syrup" labels that were identical or indistinguishable from Actavis's genuine labels and registered trademark such that the use of the labels was likely to confuse, cause mistake, or deceive. An FDA forensic chemist tested the syrup and confirmed that it contained Promethazine.

v. In late January 2019, **Runsdorf** fired Reed from Woodfield because he thought Reed was skimming cash from the DTO's payments to **Runsdorf**. Shortly thereafter, **Runsdorf** promoted Acosta to Reed's position in the scheme, so that Acosta became the principal conduit for cash from the DTO to **Runsdorf**. On or about February 1, 2019, **Runsdorf** met with Marshall and Campbell at the Woodfield Pharmaceutical manufacturing facility in Houston. The purpose of the meeting was to establish a course of dealing for future business between the DTO and Woodfield. **Runsdorf** stipulated that all future orders of syrup by the DTO would be paid up-front in cash to Acosta, after which **Runsdorf** would approve creation of the batch. Marshall agreed and paid **Runsdorf** $30,000 cash as a

gesture of good faith toward future business. From February 2019 through March of 2021, Acosta served as the principal point of contact between **Runsdorf** and the DTO. During the same time period, **Runsdorf** became much more involved in the scheme, communicating directly with Marshall and Campbell via voice calls and text messaging. **Runsdorf** promoted Patel to replace Reed as Woodfield's Director of Technical Operations. Patel instituted superficial changes in the way Woodfield handled business with the DTO. On February 7, 2019, Patel had Marshall execute a "Quality Assurance" agreement with Woodfield. The agreement incorporated Marshall's fraudulent identification and address. Eventually, Patel started creating paper records for some of the batches Woodfield made for the DTO.

w. Later in 2019, after the DTO exhausted its available supply of Promethazine, Acosta began to provide Marshall with Pseudoephedrine, Codeine, and Dextromethorphan. On October 1, 2019, for example, Acosta and Anzures-Camarena were videoed after business hours removing controlled substances from Woodfield's vault for the Marshall DTO. Acosta provided the active ingredients to the DTO to improve the counterfeit cough syrup and increase sales. At or about the same time, Acosta, Anzures-Camarena, Shaver, and Patel (the participants) began a practice of "double batching" syrup base for the DTO. "Double batching," a phrase coined by the participants, referred to the creation of additional syrup to be sold directly to the DTO. No records of the "double batching" scheme were created by the participants. This permitted the participants to sell additional quantities of syrup base to the DTO. The "double batches" were delivered to the DTO at the same time as the quantities of syrup base ordered and authorized through **Runsdorf**. The DTO purchased each "double batch" from the participants for a reduced cost of between $10,000 and $30,000 cash, which the DTO paid directly to Acosta. Acosta would then split the "double batch" fee between herself, Anzures-Camarena, Shaver, and others. Anzures-Camarena agreed to help Acosta supply active ingredients to the DTO and also agreed to participate in the "double batching," all to assist in the production and distribution of the cough syrup for her own financial gain. Further, Anzures-Camarena knew the unlawful purpose of her agreements with Acosta, Shaver, and Patel, and joined in those agreements willfully, that is, with the intent to further the unlawful purpose.

x. On or about December 10, 2019, Marshall and Campbell brought Patel a sample of Wockhardt Promethazine Syrup Plain (Wockhardt), and Patel reformulated the sample without its active ingredients. Wockhardt is a green, multi-fruit flavored prescription cough syrup that was in demand as a street drug. Patel's batch records refer to the Wockhardt analog as G1-B. In text chat conversations, Marshall, **Runsdorf**, and Acosta referred to it as the "green product." Between January 24, 2020 and February 22, 2021, Woodfield produced eight batches of the "green

product" for the DTO.

y. On April 30, 2020, law enforcement stopped coconspirators who were attempting to transport 336 pints of counterfeit Wockhardt cough syrup in Liberty County, Texas. The bottles bore counterfeit "Wockhardt Promethazine Syrup Plain" labels that that were identical or indistinguishable from Wockhardt's genuine labels and registered trademark such that the use of the labels was likely to confuse, cause mistake, or deceive.

z. On December 15, 2020, and continuing into the morning of December 16, 2020, coconspirators inside the Woodfield Pharmaceutical manufacturing facility bottled and packaged counterfeit cough syrup and supplied it to the Marshall DTO.

aa. On January 21, 2021, Marshall and **Runsdorf** communicated via text messages wherein **Runsdorf** agreed to have coconspirators produce a 250 gallon batch of "green product" for $7,500.

bb. On February 22, 2021, at approximately 12:33 p.m., Marshall hand-delivered an envelope containing $7,000 cash to Acosta at the Woodfield Pharmaceutical manufacturing facility. Upon receiving information about the payment from a cooperating witness within Woodfield, DEA agents set up surveillance around the manufacturing facility. At approximately 1:00 p.m., Woodfield employees staged 7 55-gallon drums on two pallets near the loading dock. The drums were shrink-wrapped in clear plastic. The DTO's rental truck arrived at approximately 3:36 p.m. and Woodfield employees loaded the 7 55-gallon drums into the rental truck. A coconspirator drove the truck to the Marshall DTO storage facility located at 5041 Spencer Highway in Pasadena, Texas (the Pasadena warehouse), where coconspirators off-loaded the 7 barrels of syrup. Early the next morning, DEA executed a search warrant on the warehouse and found a large amount of contraband associated with the conspiracy, including the 7 barrels of syrup. The barrels were still shrink-wrapped and had not been opened by the DTO. A DEA forensic chemist tested samples of syrup from the barrels and determined that they contained Dextromethorphan, indicating that Woodfield had added the Dextromethorphan into the syrup at the time of its manufacture.

cc. Over the course of the investigation, including the search of the DTO's Pasadena warehouse (search of warehouse) on February 22, 2021, law enforcement officers seized the following contraband:

- 1,466 (8 oz.) Actavis labeled bottles-- Interdiction/Controlled Purchases
- 331 (1 pint)  Hi-Tech labeled bottles-- Interdiction/Controlled Purchases
- 150 (4 oz.)    Amneal labeled bottles-- Interdiction/Controlled Purchases

- 136 (1 pint) Wockhardt labeled bottles-- Interdiction/Controlled Purchases
- 50 (4 oz.) PAR labeled bottles-- Interdiction/Controlled Purchases
- Promethazine (150 kilograms) from BOC Sciences--intercepted email/Title III
- 3,450 gallons of unmarked chemicals for syrup manufacturing captured on video surveillance and photos
- Thirty-six (36) 55-gallon drums (approx.1,800 gallons) of chemicals for cough syrup – Search of warehouse
- 7,528 8 oz. bottles (unlabeled but filled, sealed and capped-ready for labeling) – Search of warehouse
- 3,556 counterfeit Hi-Tech labels not affixed to bottles– Search of warehouse
- 2,358 counterfeit Akorn labels not affixed to bottles– search of warehouse
- 705 counterfeit Amneal labels not affixed to bottles– search of warehouse
- 3,440 counterfeit Qualitest labels not affixed to bottles– search of warehouse
- 344 counterfeit PAR labels not affixed to bottles– search of warehouse
- 8,247 counterfeit Wockhardt labels (orange lettering) not affixed to bottles – search of warehouse
- 14,328 counterfeit Wockhardt labels (maroon lettering) not affixed to bottles– search of warehouse
- 2,040 counterfeit Wockhardt labels (Promethazine with Codeine Oral Solution) not affixed to bottles– search of warehouse
- 10,925 counterfeit Tris Pharma labels not affixed to bottles– search of warehouse
- 35,500 (1 pint) Hi-Tech labels ordered, purchased and distributed to the DTO by Houston Label – Administrative Subpoena
- 30,600 (4 ounce) Amneal labels ordered, purchased and distributed to the DTO by Houston Label – Administrative Subpoena
- 16,800 (1 pint) Amneal labels ordered, purchased and distributed to the DTO by Houston Label – Administrative Subpoena
- 19,000 (1 pint) Wockhardt labels ordered, purchased and distributed to the DTO by Houston Label – Administrative Subpoena
- 2,750 (1 pint) Akorn labels ordered, purchased and distributed to the DTO by Houston Label – Administrative Subpoena
- 1,000 (1 pint) Akorn labels ordered, purchased and distributed to the DTO by Pasadena Printing Inc. – Administrative Subpoena
- 11,500 (1 pint) Wockhardt labels ordered, purchased and distributed to the DTO by Pasadena Printing Inc. – Administrative Subpoena
- 35,500 (1 pint) Wockhardt (Plain Syrup) labels ordered, purchased and distributed to the DTO by Pasadena Printing Inc. – Administrative Subpoena
- 15,000 (4 oz.) PAR labels ordered, purchased and distributed to the DTO by Pasadena Printing Inc. – Administrative Subpoena
- 5,250 (8 oz.) PAR labels ordered, purchased and distributed to the DTO by

Pasadena Printing Inc. – Administrative Subpoena
- 5,250 (4 oz.) Qualitest labels ordered by DTO, created by Pasadena Printing Inc. – Administrative Subpoena

- 156,702 16 oz. bottles were ordered, purchased and distributed to the DTO from Container Packaging & Supply located in Eagle, Idaho. – Administrative Subpoena/search of warehouse

dd. From 2014 through February 2021, the conspiracy between the Marshall DTO produced and distributed, or attempted to produce and distribute, approximately 65,920 gallons (527,360 pints) of counterfeit cough syrup.

## DEFENDANT'S SIGNATURE AND ACKNOWLEDGMENT

5. I have read this factual basis and stipulation and the third superseding indictment or have had them read to me and have discussed them with my attorney. I fully understand the contents of this factual basis and stipulation and agree without reservation that the United States can prove each of these acts and that it accurately describes the events about my acts and the events as recited as I know them.

Dated: _8/21/22_    _____
Adam P. Runsdorf
Defendant

## DEFENSE COUNSEL'S SIGNATURE AND ACKNOWLEDGMENT

7. I have read this factual basis and stipulation and the third superseding indictment and have reviewed them with my client, **Adam P. Runsdorf**. Based upon my discussions with the defendant, I am satisfied that the defendant understands the factual basis and stipulation as well as the third superseding indictment, and is

knowingly and voluntarily agreeing to these stipulated facts.

Dated: 8/21/2022

_____
GEORGE M. KARAVETSOS
Attorney for the Defendant

Respectfully submitted,

BRIT FEATHERSTON
UNITED STATES ATTORNEY

_____
JOHN B. ROSS
Assistant United States Attorney
Eastern District of Texas
550 Fannin Street, Suite 1250
Beaumont, Texas 77701
(409) 839-2538
john.ross5@usdoj.gov
Texas Bar No. 00788325